## DAVID TELFER, ADMINISTRATOR OF DAVID TELFER, JR., v. THE NORTHERN RAILROAD COMPANY.

1. When a railroad company is sued for damages sustained by a collision on their road, induced by the negligence of the company or their agents, and it appears that the party injured was himself guilty of such negligence or want of reasonable care as contributed to the doing of the injury, there can be no recovery.

2. "In crossing ordinary roads, caution and care are chiefly demanded to avoid running against or over anybody else; in crossing railroads it is exacted to avoid being run over yourself. In the former case the blame attaches *prima facie* to the party doing the injury; in the latter, it attaches, in the first instance, to the party obstructing the track."— *Per* VAN DYKE, J.

Telfer v. Northern Railroad Co.

3. In an action under the statute to recover damages for death caused by negligence, only the pecuniary loss or injury sustained by the plaintiff can be allowed; and in estimating that, the chances of health and life are to be considered in connection with the value of services.
4. The reciprocal duties of railway companies and persons crossing their roads discussed.

This suit was brought by the plaintiff, as administrator of his son, David Telfer, jun., against the defendants, under the act of March 3d, 1848, for the recovery of damages sustained by the death of his son, which was occasioned, as he alleged, by the wrongful act, neglect, or default of the defendants.

The plaintiff declared, in substance, that on the 10th December, 1859, defendants were owners of a railroad, extending from the New York line, in Bergen county, to Jersey City, in the county of Hudson, which crossed several highways in the county of Bergen, and that it crossed a certain highway in North Bergen, where the old Secaucus road and the New York and Paterson plank road form a junction; that the crossing at this point was dangerous, as persons going in a westerly direction along the Secaucus road, in approaching the railroad track, were prevented from seeing it on account of certain houses and outhouses there situate, and by reason of a curve in the Secaucus road near that point; that the approach to said track, on the Secaucus road, by passengers, carriages, &c., could only have been rendered safe and prudent by the defendants providing flagmen, or other servants, to be stationed at the railroad crossing to give warning to persons approaching or passing thereon, and by defendants approaching to it slowly and with caution, and by ringing a bell or sounding a whistle; that on that day the said David Telfer, jun., was riding in a wagon on the old Secaucus road, and approaching said crossing, and there got upon the track of the railroad at the junction and crossing aforesaid, as he lawfully might and without any negligence on his part, when the defendants, with their engines, cars, &c., propelled by steam, approached and came upon the

Telfer v. Northern Railroad Co.

said crossing with reckless speed, at the rate of fifty miles an hour, without having any flagmen or servants to warn persons of their approach, and without ringing any bell or blowing any whistle, by reason of all which the wagon of the said David Telfer, jun., was struck and crushed, and the said David Telfer, jun., so injured that he died ; that plaintiff was obliged to expend large sums of money for his burial, and as father and next of kin of the said David Telfer, jun., sustained great loss and damage, to the sum of $10,000 in all; whereby, and by force of the statute in such case provided, an action has accrued to him, as administrator as aforesaid, for the exclusive benefit of the plaintiff, who is next of kin to said deceased, to demand and have, &c.

A suit was also brought for loss sustained by the death of William Telfer, another son of the plaintiff, at the same time, in which a like declaration was filed. Issue was joined by the defendants in both cases, and they were, by consent, tried together at the Hudson Circuit, when the jury rendered a verdict for the plaintiff in both cases, assessing damages in one case at $936, and in the other at $1056.

A rule was obtained by the defendants, on the coming in of the *postea*, that the plaintiff show cause why the verdict should not be set aside, and a new trial granted.

The principal reasons relied on were—1st, that the evidence did not show any wrongful act or negligence of the defendants, and that it did show a want of care on the part of the persons who were killed by the collision ; 2d, that if the plaintiff was entitled to recover, the damages given by the jury were excessive.

So much of the evidence as is necessary to a clear understanding of the cases is detailed in the opinions delivered

For the rule, *A. O. Zabriskie.*

Contra, *F. B. Ogden* and *I. W. Scudder.*

CHIEF JUSTICE.   The plaintiff's two sons were killed by

Telfer v. Northern Railroad Co.

a collision between the wagon which they were driving and the cars of the defendants, at a crossing of their railroad and the Secaucus road. The wagon was overturned, and they thrown out violently, injuring them so seriously that in a short time they both died.

These actions were for negligence of the agents of the defendants in the charge of the train, in consequence of which it is alleged the collision occurred, to recover damages for the pecuniary loss sustained by the father in the death of his sons.

At the trial, the right to recover was rested on various grounds.

1. That the speed of the train was unlawful as well as unusual.

2. That the crossing was so dangerous as to require a flagman, and that none had been provided.

3. That with proper care on the part of the defendants, the collision might have been avoided.

4. That the collision was caused by the neglect of the engineer to blow the whistle or ring the bell, as required by law.

The defendants, while denying these alleged neglects, insisted that the negligence of the boys contributed to produce the collision, if it was not the sole cause of it.

The verdict was for the plaintiff in each case, and gave for the death of David $936, of William $1056.

The defendants ask to have the verdicts set aside and new trials.

1. Because the verdicts are excessive in amount.

2. Because they ought to have been for the defendants upon the evidence.

The verdicts cannot be supported upon the evidence upon any point in the case.

The speed of the train at the time of the collision was neither extraordinary nor unlawful. It could not have exceeded twenty miles an hour.

I agree to the judge's charge, that the jury could not lawfully rest a verdict for the plaintiff on that ground.

Although the question, whether the speed was excessive, was one of fact for the jury, yet they could not arbitrarily declare it so. No witness testified that the speed of the train was excessive; that it was unsafe to run at that speed.

The legislature have not seen fit to limit the speed of locomotives, and trains drawn by them, while expressly authorizing their use. I know of no limit to the speed which they are entitled to make, except that fixed by a careful regard to the safety of the trains and the passengers conveyed by them. The public interest requires in this mode of transportation the maintenance of a high speed, and the legislature have expressly sanctioned it by authorizing the use of engines, whose object we all know is to attain and preserve this high speed.

To hold that railway trains must run at such rates as to enable them to avoid collisions, by stopping the trains at the approach of ordinary vehicles to crossings, would deprive them of that upon which their usefulness and value almost entirely depend—their power almost to annihilate time and space by their rapid movements.

Until the legislature or some lawful municipal authority prescribes a contrary rule, locomotive engines may run upon the track, at such rate of speed as the exigencies of railroad companies require, and may preserve this speed at the usual crossings, notwithstanding the approach of other vehicles to the crossing upon the common highway; and under ordinary circumstances, it will not be considered either gross or ordinary negligence, or what is called want of ordinary care.

To this general rule there may be many exceptions. If the engineer, when approaching a crossing, should perceive upon the railroad track a flock of cattle crossing, or a single carriage even, he would be required, in the exercise of ordinary care, to do all in his power to avoid a collision; and failing to do so, the company would be liable for the consequences of his negligence.

So it would doubtless be held want of ordinary care to drive a locomotive across the streets of a populous town or

Telfer v. Northern Railroad Co.

neighborhood at a rate of speed perfectly justifiable when passing over an ordinary highway running through a sparsely settled neighborhood.

The care to be used in avoiding collisions with ordinary vehicles upon the public highways, must be in proportion to the danger incident to the particular locality. The nature of this locality will presently be seen. Nor did the evidence justify a verdict founded upon a failure to provide a flagman at the crossing.

The opinion of unskilled witnesses, unsupported by sufficient reasons of the necessity of a flagman at this crossing, was not sufficient to support the verdicts. Whether there was such necessity or not, although a proper matter for the decision of the jury, yet if the jury found a verdict without evidence on this point, or against the evidence, it should not be permitted to stand. The place was a very sparsely populated neighborhood, but few dwellings, not half a dozen, near the crossing. It was of so little importance as not to be a regular stopping place, only a flag station.

At the crossing, the railroad and the common road were about the same grade. The railroad did not at this point suddenly emerge from a deep cut, so as to cut off a view of the cars until the wagon was upon the track.

The approaching train could be seen for half a mile upon the track before reaching the crossing.

At a point one hundred and seventy feet from the track, on the road down which the boys were coming, the approaching train could be seen when at a distance of two hundred and sixty feet.

There were here no trains playing back and forth, as is the case near stations in cities and towns, calculated to deceive the boys when approaching. The only source of danger was the regular and occasional trains of the company, which upon this road were infrequent. The hotel of McCollum was the only considerable building near.

There was no evidence that the number of passengers along the highway was so great at this point as to render a

flagman necessary, as in the crowded streets of a city where the passing must be constant, and it would be highly inconvenient for each carriage to come to a stand, to see whether trains were approaching.

No municipal or legislative requirement rendered it obligatory upon the company to have a flagman there. In the absence of such requirement, it should have appeared that there was something to distinguish this from ordinary crossings, some peculiarity in the character of the ground, which so plainly indicated the necessity of a flagman as to leave no doubt of the obligation of the company to put one there. The company should not have been held liable on this ground, unless for the neglect of a very manifest duty; one which the company could not have failed to perceive without great carelessness.

There is no pretence that such was the case there. To sustain a verdict upon such evidence to make out the necessity of gates or a flag, would impose upon every railroad company the necessity of keeping flagmen or gates at almost every crossing, and almost amount to a prohibition of such roads as that of the defendants, sustained by a very limited number of passengers.

The topography of the place clearly shows that persons about to cross may, with ordinary care, always ascertain when a train is approaching, and thus avoid a collision.

Whether the whistle was blown or bell rung upon the approaching engine, is immaterial, if the boys knew, or with ordinary caution might have known in time to avoid the collision, that the train was approaching; but if it were material, I think the decided weight of the evidence, indeed all the reliable evidence in the cause, shows that the whistle was blown and bell rung as required.

The negative testimony of the occupants of the bar-room at the time of the accident, that they did not hear it, is not entitled to much weight; accustomed as they were to the sound, it would be strange if they recollected hearing it.

The testimony of one credible witness, that he did hear it, is far more reliable, and should outweigh theirs.

Nor does the evidence show any ground for the conclusion that there was a neglect of proper means to avoid the collision, as soon as its danger became apparent. Every means was taken to arrest the progress of the train, when the engineer saw the attempt to cross in front of it.

Where common highways and railroads intersect, the trains have the right of way, as against ordinary carriages; it is the duty of the latter to keep out of the way of the former.

Although the engineer saw the boys approaching the crossing, while yet at such a distance as not to indicate their ignorance of the coming train, it was his right to suppose they did not mean to attempt to cross before the train; and if he acted upon that impression, it was not negligence or want of ordinary caution on his part, although the supposition proved to be groundless.

The evidence shows that everything was done to arrest the train as soon as a collision seemed probable. The brakes were applied, and the engine reversed, but it was too late. The collision took place, and the boys were killed.

It was not pretended, at the trial or here, that the train might have been stopped sooner, so as to avoid the collision, or that the failure to do so arose from the want of proper brakes, or men to use them.

Assuming, therefore, the right of the train to pass that crossing at its usual speed, or any speed safe for itself when there seemed to be no danger of a collision, I cannot see of what negligence the persons in charge were guilty. There was no want of caution on the part of the conductor, no recklessness of danger. The train was, both before and after it was perceived the boys intended to cross in front of it, managed with care and judgment by all concerned. They did everything incumbent upon them, and omitted no precaution to avoid the accident.

Their conduct was not the cause of the accident, and did

not even contribute to produce it. It was undoubtedly caused by the unexpected conduct of the boys in attempting to cross in front, and because their intention to do so was not manifest until too late to stop the train, and let them pass. But I think the evidence was almost conclusive, either that the boys drove upon the crossing after they saw the approaching train, or might, with ordinary care and prudence, have seen it. The evidence on this point is both positive as well as circumstantial.

The accident occurred about the usual time for the passage of the cars, a few minutes later, in broad daylight, at ten o'clock in the forenoon. The boys knew this to be the usual time to expect them; they passed there almost every day; they should have been on the lookout. They were thoroughly conversant with the topography of the place; they must have known how far the cars could be seen, and what obstacles were in the way. They either did not stop to listen, or if they did, heard the train, and drove on. Many others farther off than they, whose opportunities were not so good as theirs, heard it; if they did not, it was their own fault. If they did stop, as almost all the witnesses say they did, about forty feet from the track, and if they were, as the testimony shows, seen by those upon the train, they must have seen it, and should have waited until it passed.

The collision was seen, or the boys and their wagon, just before it occurred, by Van Orden, the engineer, Paterson, the conductor, Mr. Westervelt, a passenger, and Dennis Connel and Cookson, brakemen, also by John Kunz, who lived near by, and says he saw the boys pass his house in the wagon just before the accident occurred, all witnesses for the defendant; and Jane Smith, a witness for the plaintiff, who saw the occurrence from her house, eight hundred or nine hundred feet from the crossing.

Van Orden says: I saw this wagon before the boys were struck; when I first saw them we were about half a mile from the station; that he saw the wagon coming down past the hotel—the train was then going sixteen or eighteen miles

an hour; that he blew the whistle at the usual place; that about three hundred yards from the station he blew on the brakes to decrease the speed of the train, and immediately blew them off again; when he did so, the boys stood in the little hollow near the track—the horse was standing still; that one of the boys looked out; that the middle curtain of the wagon was up on the south side; that the boy was driving, and looked out toward the train; that he got a signal from the conductor that there were no passengers to land, and then let on steam—just then the wagon started ahead; that he blew the brakes on and reversed the engine, but the collision took place. He further said, that when the horse started, he made a move as if hit with a whip.

Paterson, the conductor, says: that on that day, when he came to the door of the baggage car, in which he was while the train was passing through a clump of trees, sixteen hundred and sixty-one feet from the crossing, the whistle was blowing; that he swung his body out towards the platform as usual—when he looked, he saw the wagon standing; that it attracted his attention; that the curtain was up, and the boy he saw looked out towards the train; that he had something in his hands; the horse was standing. He gave the engineer the signal, no passengers, and the brakes were let off; when the train got to the barrack the horse started, the boy who was driving reached forward over the dash-board, and raised the lines or a whip—the horse was galloping; that after the boys started, the signal to apply the brakes was given very loud and very quick in succession.

Westervelt, the passenger, says: going through the woods, he heard the whistle, an alarm whistle; stepped out on the platform of the first passenger car, and looked ahead; saw a horse and wagon standing from the track some distance on the right hand side of the track on the plank road; they were not moving at all when he saw them; he saw one person in the wagon who was looking out forward; he saw the wagon standing there, and he supposed everything was

right; he then stepped in, and heard nothing more until he heard the boys were hurt.

Connel, the brakeman, says: he saw the wagon moving down towards the track, just coming to a stop—this was when he put the brakes on; coming through the clump of trees, he got a signal to let go, and as he did so he got a signal to put them on, and did so.

Cookson's testimony is substantially the same: he saw a wagon near the track coming to a stop; looked out after putting on the brakes; saw the horse approaching the track; the horse started, and was going across as if he had been whipped or got scared; one of the boys was leaning over the dash-board.

Paterson, the conductor, says: that one of the boys, after the accident, at McCollum's, where he was carried, was asked by him if he saw the train, and answered yes; that he asked him why he tried to get across, and the boy answered he thought he could get across. Cookson testifies to the same thing. Although this testimony was seriously controverted, I think it is not without the bounds of possibility, as well as probability; yet I have formed my opinion of the case, laying it out of view.

Jane Smith, called for the plaintiff, saw the accident from her house, seven or eight hundred feet distant; the wagon was going from her; she says she saw the boys pass the McCollum house, and that they did not stop before they were struck; she first saw them near the sign post—she then heard the train. It is not remarkable that at that distance she did not see the wagon, going from her, stop. We see, however, that even she heard the train coming while the boys were in a place of safety.

This is the substance of the evidence on this important point, and it demonstrates that the boys saw or heard the coming train in season to avoid the collision; that they stopped a short distance from the track; that, seeing them stop, the engineer went on, supposing they were going to stand

still; that, intending to cross in advance of the engine, they suddenly started, or the horse became unmanageable.

In either event the defendants are not liable, if it was impossible, at that time, to stop the train soon enough to avoid a collision; they are not liable either for an accident in part produced by the wilfulness of the boys, or for an accident caused by the fright of the horse.

By this evidence, the case is brought within the rule laid down in the cases of *Moore* v. *The Central Railroad Company*, 4 *Zab.* 268, 853; *Runyon* v. *The Central Railroad Company*, 1 *Dutcher* 556, that where the party injured, either by his conduct or want of care, contributes to the production of the injury complained of he cannot recover.

The damages were excessive. The jury allowed for the loss of the services of the boys more than by any calculation they can be shown to have been worth to the father, considering the period of service which yet remained, and his duty as a parent towards them, and their liability to sickness and death. For David's services they gave $936; he had about —— years to serve his father. For William's, they gave $1056; he had about seven years yet to serve his father.

The common law gives no action to a father sustaining such an injury. The action is given by statute. *Nix. Dig.* 193. The language of the act upon the subject of the damages is, " the jury may give such damages as they shall deem fair and just with reference to the pecuniary injury resulting to the wife and next of kin of such deceased person."

It is manifest, from the structure of this section, that it was not designed to vest an arbitrary discretion in the jury, to give what damages they may think fair and just, without reference to any fixed standard by which to estimate them. The important qualifying words are added, referring to the pecuniary injury resulting to the widow or next of kin. The injury forming the basis of calculation must be pecuniary— nothing else can enter into the estimate. There can be no recovery for loss of society or wounded feelings, or anything

else which cannot be measured by money and satisfied by a pecuniary recompense.

The third section of the act makes it the duty of the plaintiff, to give a bill of the particulars of the nature of the claim, in respect of which damages shall be sought to be recovered. This does not refer to the circumstances attending the death; that is not what is to be called for and given; the declaration gives that; but it is to be a statement of the particulars of .the pecuniary loss sustained. The object of this provision is to enable the defendant to know in what way the damages are to be estimated, so that we may come prepared to meet that part of the case.

Some limitation was imperatively required, by obvious considerations, upon the amount to be recovered.

The legislature of New York, in 1847, passed an act of this character, and in 1849 limited the sum to be recovered under it to $5000.

In *Quin* v. *Moore*, 15 *New York Rep.* 434, which was an action under the New York act containing the same provision as ours in respect to damages, the court say.: "The theory of the statute is, that the next of kin have a pecuniary interest in the life of the person killed, and the value of this interest is the amount for which the jury are to give their verdict." Neither the personal wrong or outrage to the decedent, nor the pain and suffering he may have endured, are to be taken into the account.

The English act, 9 and 10 *Vict.*, c. 93, contains a provision, that the jury may give such damages as they may think proportioned to the injury resulting from such death to the parties, respectively, for whom and for whose .benefit such action shall be brought.

In *Blake* v. *Midland Railway*, 18 Q. B. 93, in an action under this act it was held, that nothing could be recovered, except the pecuniary loss sustained by reason of the death, by the persons for whose benefit the action was brought, and that the measure of damages was not the loss or suffering of the deceased, but the injury resulting from the death to his

family, and that nothing was recoverable as a *solatium*. Coleridge, J., makes this remark, that it must be recollected that the act applies not only to great railway companies, but to little tradesmen, who send out a cart and horse in the care of an apprentice.

It would seem that this would have been the proper rule of damages if it had not been prescribed by the act. *Ford* v. *Monroe*, 2 *Wend.* 210 ; *Park* v. *The Mayor of New York,* 3 *Coms.* 489.

The rule to show cause must be made absolute.

VAN DYKE, J. These two suits were tried together, and were brought by the father to recover compensation in money for the loss of his sons, who were killed by coming in collision with a locomotive and train of cars. It is difficult to look at these suits in the light of mere actions for damages, without being influenced, in some measure, by considerations, such as we labor, almost in vain, to turn aside from. The sad fate of the two lads, and the grievous affliction which so suddenly fell upon a parent's heart, are well calculated to awaken the kind sympathy of every human bosom. Sympathy and condolence we may indeed extend to the plaintiff, but unfortunately for him, we cannot permit these to influence us in the sterner duties which we have to perform in the cases. The only question which we can examine into is, whether he has shown himself entitled to sustain the verdicts which he has obtained. The jurors doubtless discharged their duty honestly and conscientiously in these cases ; but it is none the less the duty of the courts to set these verdicts aside, if they be found contrary to the law and the testimony.

The charge is, that this occurrence took place through the carelessness, negligence, and improper conduct of the defendants. It seems to be very well settled, that if it did not take place in some such way there can be no recovery ; but it is equally well settled, that although there may be carelessness and negligence on the part of the party doing the injury,

yet if there was an equal amount of carelessness, negligence, and improper conduct on the side of the party injured, he cannot recover for such injuries. And this is the answer which the defendants make to the plaintiff's charge, that the carelessness and negligence was not on their side, but on the side of the parties injured : and that, for this reason, the verdicts are contrary to the law and the evidence.

It is not an easy matter to determine always what constitutes legal negligence and carelessness on the part of those who conduct railway trains, for we cannot very well compare them with any other mode of land conveyance. Railroads and railroad trains and railroad travel are specially authorized by law. The legislature are supposed to know that these trains move with immense weight and power and speed, and they authorize them to do so, neither limiting nor restraining them, to any extent, in these respects. It is also well known that at the rate of speed at which they go they are far less governable, so far as stopping is concerned, than in any other mode of land travel, and far more dangerous in cases of collision. This the legislature are supposed to know and understand, and yet they seem to authorize them so to move. They are required, it is true, to ring their bells, blow their whistles, and keep up sign-boards, but they are not required in any case to lessen their speed when crossing any other road, or to station signal men there, except when municipal corporations occasionally impose upon them these duties. Nor would the company be responsible for damages arising from collision when there was no whistle blown, or bell rung, or sign-board up, if the absence of these things in no way contributed to the accident. It is difficult, therefore, to determine that a company is guilty of negligence, or carelessness, or improper conduct, while it is only doing those things which the legislature has, by formal enactments or by necessary implication, expressly authorized ; for instance, many of our railroads, which frequently cross our common highways at very acute angles, and after running parallel with them and close to them for long distances, thus frightening the

Telfer v. Northern Railroad Co.

horses and terrifying and endangering all persons traveling on such highways, would doubtless be considered public nuisances, and be indictable as such, if carried on by private individuals not authorized by law ; yet when the legislature, which is supposed to take all these things into consideration, expressly authorize them so to do, they cannot be considered as nuisances. This was so held in 4 *Barn. & Ald.* 30,* *Roscoe's Crim. Evidence* 794.

It is very easy, however, to see how all other persons who attempt to go upon or across a railroad track are placed under the necessity of using much greater care and caution than when going on or across any ordinary road ; for all other persons and conveyances are usually under immediate control, and may be stopped instantly if any danger threatens; but railroad trains are notoriously otherwise, and hence greater care and caution are necessary to avoid them. All other conveyances can turn to the right or to the left, or in any other direction, to avoid accidents; but railroad trains can do neither. They have a single fixed track, in which they must move, and can go nowhere else. All persons and things are perfectly safe from collisions except on this narrow track, and cannot be harmed unless they go upon that track; consequently every person is under the strongest possible obligation not to venture upon that track when the cars are about to pass. If he do so, and get hurt, it can scarcely be otherwise than that the risk and the fault are his own. Nor does it make any difference how strongly the party may believe or suppose that he can cross with safety. If he get hurt, the miscalculation was his own, and the consequences must rest upon him. Nor does it at all change the case that the party did not think of the cars. He was bound to think of them if he knew the road was there. Nor is it any excuse that he was in a covered wagon, and did not see, or did not see fit to look ; for a person cannot close his eyes or cover himself up in the midst of danger, and then plead that he could not see. Neither can it be successfully urged that the persons injured were too young to exercise the prudence and

*The King v. Pease.*

discretion of an adult; for this is the very reason, if so, why they should not have been exposed to such a peril. It was carelessness or recklessness to do so.

It is not a trifling matter to stop a train of cars where it would not otherwise stop when it is running on time, and is required to pass another train at a given point, and when the failure to do so might produce serious consequences. I do not think a conductor is bound to stop his train because he sees an individual standing on the track a quarter of a mile ahead of him; because he has every reason to suppose that he will leave the track before the cars reach him. Nor do I think he is bound to stop his train because he sees a vehicle slowly approaching the road, or quietly standing a few yards from it, with the horse's head towards it; for he has every reason to suppose that they will not attempt to cross until the train be passed; and if they suddenly attempt to do so when too late to stop the train, and get injured in the effort, the fault is not that of the company nor its agents, unless their conduct be so grossly negligent, as that the exercise of proper and reasonable caution and prudence on the part of the party injured could not have protected him from the injury.

It is true, then, that these verdicts are contrary to the law and the evidence, or either of them? If they are, they should be set aside. The law on the subject seems to be so well settled by numerous decisions, to be found scattered through the law books, and is so unmistakable that I shall not occupy time in referring to it. It may be fairly and safely assumed that, where the negligence, or carelessness, or improper conduct of the company or its agents is clear, or where the exercise of a reasonable amount of care and prudence on their part would have prevented the collision, and they did not exercise it, they will be liable, provided the party injured was not himself guilty of the same want of reasonable care and prudence; for if he too, by the exercise of a reasonable amount of care and prudence, might have avoided the accident, and did not exercise it, he cannot

recover, even though the company were culpably negligent. He cannot visit the consequences of his own indiscretion, folly, or want of judgment upon the adverse party. He must bear them himself.

I cannot say that the plaintiff did not offer evidence enough to warrant the cases in going to the jury, yet I am forced to say I think it was very slender; unless, indeed, the mere fact that the boys were killed by the collision is of itself sufficient to make out the case in the first instance; a proposition which I think we cannot properly admit. Of the seventeen witnesses which he offered, but one only seems to have seen the occurrence at all, and she saw it through the window of her dwelling-house, at a distance of some eight hundred feet, and when looking directly on the rear of the wagon, which was closed behind. She did not hear either bell or whistle before the collision; she first saw the boys by the sign-post, some ninety feet from the track; she did not then see the cars, but heard them. Several of the witnesses were in the public house near by, with closed doors and windows, who did not see the occurrence until it was past, and most of whom say they did not hear the whistle till after the collision; a fact which they could not very well know, as they did not see precisely when it did take place. Another of the plaintiff's witnesses says he stood in the shed and saw the cars for a considerable distance, till within thirty or forty feet of the crossing, but the blowing of the whistle and the noise of the cars frightened his horses, and he did not see the accident. A number of witnesses were also examined to show that the crossing was a dangerous one. It certainly was somewhat dangerous, and so is every other crossing, unless some care and caution are used by persons attempting to pass over; but, according to the map or diagram produced by the plaintiff, the crossing was not remarkably dangerous. But no witness on the part of the plaintiff says anything which goes to show, whether the boys acted prudently or imprudently, whether the fault was wholly their own, or whether it was not.

The testimony on the part of the defence is much more

VOL. I.            N

definite and positive. Six witnesses say they saw the occurrence; five of them were on the train, though not all in the defendants' employ. They all concur in saying that the whistle was blown some half mile from the station ; the brakes were put on to check the speed until it could be ascertained whether there were any passengers to get on or get off at the station. When the signal 'was given that there were no passengers, the whistle was again blown to take off the brakes. In an instant it was again blown, violently, to put them on again, indicating danger, and continued to blow violently until after the accident. The brakemen say that the brakes were instantly applied. The engineer says the engine was instantly reversed, and that the bell was rung for a considerable distance.

These five witnesses concur in saying that when the brakes were last blown off, and the cars some two hundred and fifty or three hundred yards from the crossing, the horse, wagon, and boys were quietly standing back from the track, a distance which measures thirty-two feet ; that one of the boys was then looking out of the front of the wagon at the train, but at the moment of blowing off the brakes, the horse, by a stroke from the lines or a whip, or something else, was started across the track, and at such speed that he was on a gallop when the wagon was struck. A sixth witness, who was not on the train, but was close by, confirms the testimony of the other five, so far as the conduct of the boys is concerned. He says that he saw the cars, and told the boys that they were coming ; that the older boy answered that he did not care. He says that they stopped, however, a short distance from the track ; he saw the boy strike the horse with the lines, and he scared and started north, and the cars caught him.

All this evidence touching the conduct of the defendants, as well as that of the boys, is wholly uncontradicted, except by the witness who saw the occurrence from her window, at a distance of eight hundred feet. She says the wagon did not stop at all ; but as she was some distance off, and was looking directly at the rear of the wagon, and through the glass of

Telfer v. Northern Railroad Co.

her window, she could not very well tell with certainty, and may be mistaken as to that fact; but the others all saw the occurrence from points which did not admit of mistakes in that particular.

Three of the witnesses also say that they heard one of the boys say, after he was hurt, that he saw the cars coming, but thought he could get across. The speed of the cars is estimated by some at from eighteen to twenty miles per hour, and by others at from thirteen to fifteen.

Does this evidence, then, taken altogether, show any negligence or improper conduct on the part of the defendants or their agents? If it does, I am wholly unable to perceive it. I do not see what they could have done that would have prevented the accident that they did not do. If it be true, and it is abundantly proved, that the boys had stopped their wagon, and were looking at the cars as they approached, the conductor was not bound to stop the train to see what they intended to do next; for he had every reason to suppose that, having once stopped, they would remain in that condition until the train should be passed. The evidence of persons that they did not hear the bell or the whistle, when they were not in a good condition to hear them, or if they heard the whistle at all, that it was not blown until after the collision, when they did not see the collision at all, cannot have very great weight against the evidence of those who did see and hear, and say it was positively and directly otherwise.

Does the evidence, on the other hand, show that the conduct of the boys was cautious and prudent, such as the occasion called for? On the contrary, it seems difficult to imagine a case, where the exercise of those duties could have been more deplorably absent. Their action was rash and indiscreet in the extreme. The locomotive must have been within but a few yards of them when they attempted to cross; they had but thirty-two feet to go, and with their horse on a gallop, they had not yet got over when they were

struck, showing that the train was very close to them when they started.

Unpleasant as the idea is, there seems no way of resisting the conclusion that the fault, as well as the misfortune, was wholly and entirely their own. It appears, too, by the evidence of their sister, that these boys had been in the habit, one or the other of them, of going this way every day for the last two or three years, and returning about the same time; that the horse was the one they usually drove, and that he was gentle, and so said others; so that nothing can be urged in their favor on the score of their being ignorant of the peril into which they went.

These verdicts, therefore, are contrary to the law of the land which governs such cases, and that law should be fully and strongly declared and maintained; for the public are as much concerned in the caution and prudence of those who cross railways, as they are in the caution and prudence of those who conduct the trains. If this occurrence, happening just as it did, had left the boys unharmed, but had thrown the train from the track, killing half a dozen passengers, and maiming four times that number, we should have seen more clearly the force of this remark. The necessity for caution, therefore, is tenfold greater when crossing a railroad track than in crossing any other road, and the culpability of their neglecting to exercise that caution is ten times as great as in ordinary cases. In crossing ordinary roads, caution and care are chiefly demanded to avoid running against or over anybody else; in crossing railroads, it is exacted to avoid being run over yourself. In the former case the blame attaches *prima facie* to the party doing the injury; in the latter, it attaches, in the first instance, to the party obstructing the track. Common prudence and common caution require every person approaching a railroad crossing, if he knows of it, to pause, and see if he can cross with safety; and if there be any danger at all, he is bound to wait until it is past; and although there may be much practice to the contrary, still if he do not do this, he does not exercise either common prudence or common caution.

The evidence in these cases affirmatively and clearly proves the most culpable rashness and improper conduct on the part of the boys, and therefore the verdicts are contrary to the law which we are bound to apply to them, and for this reason they should be set aside.

The verdicts, too, are clearly against the evidence in the cases; not merely against the weight of evidence, but contrary to the whole evidence; and they should be set aside for this reason also; and to this conclusion I should have been brought, as a matter of necessity, even if the defendants had offered no evidence at all, for the reason that, with their evidence, or without their evidence, there is nothing in the whole of it which shows affirmatively that the boys exercised any care, prudence, or caution whatever to avoid the occurrence, or that the fault was not clearly and positively their own. These things, or some of them, the plaintiff was bound to show before he could be entitled to the verdicts.

It is insisted, also, that the damages in these cases are excessive. In the case of David they are assessed at $936, and in the case of William at $1056. In the view which I have taken of the cases, it is not necessary to examine this part of them, but the question presented is one of importance, and deserves the consideration of the court, either now or at some other time. The jury seem to have been left pretty much to their own conclusions in the matter, as there was but little, if any evidence to throw light on the subject beyond the fact of the relationship between the father and his children; and it may be doubted if they could have reached the conclusions which they did, if they had been governed by correct legal principles.

The action is the creation of the statute, and it is needless to say that it must conform strictly to it. It is liable to great abuse, and the court should see that every verdict which is rendered contrary to it should be set aside. It is simply an action to recover in dollars and cents, a compensation for the loss and damages which have actually been sustained. As the father of his children, the plaintiff was entitled to their services until they should arrive at the age

of twenty-one years; and what those services might reasonably have been expected to be worth he was entitled to recover, and nothing more, unless it be expenses growing out of the injuries, subject to the burthens and encumbrances which that relationship imposed upon him. Nothing can be allowed for the mental anguish which, as a parent, he is supposed to have suffered. Nothing for the satisfaction and comfort of having his sons—nothing for the loss of their society and associations.

The damages in the case of William are fixed at $1056. He was over thirteen years of age, and had something over seven years to serve his father. There is an allowance,then, of about $150 per year on an average. This is about what the services of a full grown man would be worth in the business in which the plaintiff was engaged, when boarded, provided he should work faithfully the whole of that time.

If this is the principle upon which the jury proceeded, they were unquestionably wrong; for as the plaintiff was bound not only to feed but to properly clothe and educate his son, and to take care of him if sick, pay his physician's bills, &c., it may well be doubted whether his services would have been worth any more than his board, clothing, education, and other incidentals, previous to his arriving at the age of eighteen years. At all events, these things should have been taken into consideration by the jury, and proper deductions made on account of them, as well as for the days of idleness, of absence and of pleasure, incident to such relationship, and likely to intervene. The jury seem, too, to have gone on the supposition that William would remain in sound health, and serve faithfully during every day of the time; whereas they were bound to consider the probability that, through accidents, sickness, and the like, he might be unable, possibly for a considerable portion of the time, to perform service at all, when he would be an expense, rather than an advantage. Then, too, they seem to have taken it for granted that he was certainly going to live through the whole period, and his life, during the whole of that time, the defendants are made to insure; whereas it was possible he

might die the next day, when his services, of course, would have ceased. We may be quite willing to bind ourselves to pay a man $1050 for seven years' service, if we can certainly have that service secured to us, when we would not be willing to pay half that sum if we are to take all the risk of his sickness, accidents, and death in the meantime. These things, too, should have been taken into consideration and allowed for; and if they had been, all of them, it seems difficult to see how the jury could properly have *calculated* the damages at $1056. The same principles and rules apply of course to the case of David; and if this were the only reason on which we are asked to set the verdicts aside, I should feel constrained to yield to it, believing, as I do, that the jury *must* have proceeded upon erroneous principles, in this respect, in reaching their conclusions.

ELMER, J. The weight of evidence in this case so clearly indicates, that the culpable negligence of the plaintiff's sons contributed to produce the collision which caused their death, that I think we are bound to make the rule for a new trial absolute.

I am also of opinion that the damages were excessive. The jury had no legal right to give more than the actual pecuniary injury to the plaintiff, the father and next of kin of the persons killed, resulting from their death. In this case there was little or no difficulty in arriving at a correct result. The boys were of the ages of thirteen and fifteen years, so that the father was entitled to fourteen years' service from them before they became of full age. The true rule for measuring his injury was the cost of procuring equivalent help from others, whose clothing and other necessaries should be furnished by him; to which might, perhaps, be added reasonable funeral charges, beyond what was expressly contributed for that purpose. Upon the most liberal computation, these expenses could not have amounted to anything like the sum awarded by the jury.

Verdict set aside.

CITED in *Bonnell* v. *D., L. & W. R. R. Co.*, 10 *Vroom* 192; *Morris and Essex R. R. Co.* ads. *Haslam et al.*, 4 *Vroom* 151; *Blaker's Executrix* v. *Receivers of N. J. Midland Co.*, 3 *Stew.* 244.