ANTHONY DiDOMENICO, PLAINTIFF-RESPONDENT, v.
PENNSYLVANIA-READING SEASHORE LINES, SOCONY
MOBIL OIL CO., INC., AND RAYMOND PARSONS,
JOINTLY, SEVERALLY OR IN THE ALTERNATIVE,
DEFENDANTS-APPELLANTS.

Argued November 20, 1961—Decided January 22, 1962.

456

457

*Mr. Blaine E. Capehart* argued the cause for defendant-appellant Pennsylvania-Reading Seashore Lines (*Messrs. Capehart & Scatchard,* attorneys).

*Mr. John R. Bennie* argued the cause for plaintiff-respondent.

The opinion of the court was delivered by

PROCTOR, J.  This case arises out of a railroad grade-crossing collision.  Plaintiff sued for personal injuries and property damage sustained when his automobile collided with a freight train operated by defendant Pennsylvania-Reading

Seashore Lines (Pennsylvania). The complaint charged Pennsylvania with negligence, and also named Socony Mobil Oil Co. (Socony) and its driver Raymond Parsons as co-defendants, charging that their negligence was also a cause of the accident. After the plaintiff put in his case, all the defendants moved for involuntary dismissal of the action. The trial court granted the motions of Socony and Parsons, but denied Pennsylvania's. At the end of the whole case Pennsylvania moved for a judgment of dismissal. The court granted the motion and plaintiff appealed as to all defendants. The Appellate Division sustained the trial court as to Socony and Parsons, but reversed as to Pennsylvania. We granted Pennsylvania's petition for certification. 36 *N. J.* 27 (1961). Since plaintiff does not cross-appeal the dismissal as to Socony and Parsons, the sole question before us is whether the evidence presented a jury question as to the liability of Pennsylvania.

Pennsylvania maintains a single track rail line which intersects Route 130 in the Township of Upper Penns Neck, Salem County, crossing the road at grade in a northeast to southwest direction. Route 130 is straight and level for a considerable distance in the area of the crossing, and runs in a north-south direction, forming an angle of 149 degrees at the point where it crosses the track. The highway is about 60 feet wide, consisting of two 10 foot concrete lanes in the center, one lane for northbound and the other for southbound traffic, with macadam shoulders each about 20 feet wide. A broken white line separates the two concrete lanes, but becomes solid 300 feet south of the crossing. There is also a railroad advance warning sign about 500 feet to the south.

The crossing is marked by two warning sign posts, one on each side of the 60 foot wide roadway. These signs are 14 feet high and contain crossbucks inscribed in reflector letters: "Railroad Crossing." Four back-to-back type red lights are mounted upon each post at a point about seven feet from the ground, two lights facing south and two

facing north. Immediately below the lights on each post is a rectangular reflector sign reading: "Stop On Red Signal." Each post also has a bell mounted at the top. The lights and bells operate automatically; when a locomotive reaches a point some distance prior to entering the crossing, it trips a switch which causes the bells to ring and the lights to flash alternately, thirty to forty times a minute, until the train has cleared the crossing. Because of the angle of the crossing the signal post on the northbound side is located 21 feet six inches north of the point at which the track crosses the center of the road, while the post on the west side is 23 feet two inches south of this point. Because of these locations, a northbound vehicle would not reach a point in line with the warning sign on its side of the road until after it had crossed the track.

At 1:00 P. M. on October 24, 1958, the plaintiff, a confectionery salesman, was driving his automobile in a northerly direction along Route 130 when he collided with or was struck by an engine pulling a Pennsylvania freight train through the crossing. He had driven through the area of the accident on many prior occasions, using it for business trips about twice each month. He was aware of a railroad crossing along the highway, but did not know its exact location. He was proceeding north on Route 130, a 50-mile an hour highway, at 30 to 35 miles an hour. The road was dry, the day sunny and clear, and he could see one mile ahead. According to him the traffic was heavy in both directions. About 250 feet before reaching the crossing, he drove his car slightly off to the right of the concrete highway to pass a pickup truck which was stopped to make a left-hand turn and he continued without diminishing his speed. Although he saw a Socony tractor-trailer stopped ahead on the macadam shoulder to his right, he said he thought nothing further about it since trucks often parked on shoulders of the road, and he noticed nothing to indicate that he was approaching a railroad crossing. However, according to plaintiff, when he reached a point at which

his car was parallel to the tractor-trailer, he noticed a southbound automobile stopped ahead in the southbound lane and heard a loud air horn. Sensing danger, but without seeing the tracks, he jammed on his brakes. After his automobile came to a stop he saw the train "was coming straight for me" from the right. He tried to back the vehicle away but it stalled and was struck in the left front by the oncoming locomotive. The car was spun around and finally came to rest 32 feet away in the southbound lane of the roadway.

The plaintiff testified he did not see the warning post with its blinkers on the east side of the road because it was blocked by the stopped tractor-trailer and he did not see the tracks proper because they were imbedded in the concrete. Two witnesses called by the plaintiff had an unobstructed view of the collision. The first, Socony's driver Parsons, said he was proceeding north and drove his tractor-trailer onto the macadam shoulder to stop at the rail crossing. Socony's vehicle is required by *N. J. S. A.* 39:4–128 to stop at all railroad crossings whether or not a train is approaching. Parsons stopped about 15 feet south of the track; the left side of his truck being a foot to 18 inches east of the concrete lane, and the right side "at least eight foot" from the edge of the shoulder. The tractor-trailer was 30 to 40 feet long and 8 to 10 feet high. Since the lights were not flashing, he followed his customary procedure and stopped on the shoulder instead of the concrete highway so he would not obstruct the flow of traffic. He testified that the lights on both sides of the road began to flash just after he stopped and that they continued to flash until after the collision. He heard the air horn of the locomotive, looked to his right and saw the approaching train. He testified that he first saw plaintiff's automobile in his rearview mirror when the plaintiff was about 400 feet south of the crossing. When he next observed plaintiff's automobile it was approaching the rear of the trailer at what appeared to be excessive speed if

plaintiff intended to stop for the train. He heard the screeching of brakes and then saw plaintiff's car slide past him and collide with the engine. He further said that southbound traffic was light, that the only vehicle in that lane was stopped, waiting for the train to pass. This automobile was the one plaintiff saw before the accident and belonged to the plaintiff's other eyewitness Simpson. He testified that the blinker on the west side was operating effectively and the air horn was sounded by the train, but he did not notice the blinker on the east side. Although he stopped his car close to the track, he had seen the lights flashing 200 to 300 feet away. He said the traffic in both lanes was light; there were no moving vehicles within 200 feet of plaintiff's car. It appeared to Simpson that plaintiff was approaching the track slowly "as though he were trying to see where the train was."

Pennsylvania's train was proceeding in a southwesterly direction at 25 to 30 miles an hour. According to the train personnel the engine's 44-pound bell began to ring and the air horn was sounded at a point about 600 yards before the crossing. These warning signals continued to sound intermittently up until the time of the accident. The engineer was sitting on the right side, and because of the length of the engine, his view of the left side (plaintiff's side) of the crossing was obstructed. However, he did see the blinker lights in operation on the right side or southbound lane side of the crossing. The first warning that he had of the accident was when the fireman who was seated on the left side of the engine told him to put on the brakes, "We hit a car." He brought the train to a stop 250 to 300 feet west of the crossing. The fireman confirmed the fact the bell and air horn were sounding. He saw the crossing warning lights flashing, but any early view of plaintiff's car which he might have had was blocked by billboards and the stopped tractor-trailer.

The railroad crossing was originally constructed in 1937 and the plans for the safety devices were approved by the

Board of Public Utility Commissioners. No additional safety devices had been installed since 1937. Although normal traffic on Route 130 was described as "heavy," the traffic load reached its peak prior to the opening of the New Jersey Turnpike and it is not now as heavy as it was then. Some physical and structural changes have altered the area of the roadway since 1937. Billboards 24 feet long and 20 feet high have been erected at both the northwest and southeast corners of the intersection, about 36 feet from the edge of the shoulders. An auto repair shop building is located near the southwest corner. A trailer camp and a building have also been erected in the vicinity south of the crossing, and vegetation has been permitted to grow wild along the railroad track. However, none of these block a motorist's view of the warning posts placed at the crossing. The only obstruction in the present case was the Socony trailer which, according to Fisher, a civil engineer called by the plaintiff, would obstruct a view of the flashers on the east side of the road when a northbound vehicle came within about 100 feet of the crossing.

Plaintiff offered to prove that other accidents had occurred at the crossing to show it was extra-hazardous and that Pennsylvania had notice of this condition. Over the defendant's objection, the trial judge ruled that he would permit this testimony in the absence of the jury, to determine whether it was evidential. Thereupon a police officer testified he had been called to the crossing on two occasions involving accidents, one prior and the other subsequent to the collision in the present case, but he did not in anyway describe the details of the accidents. The trial judge held the police officer's evidence inadmissible and the testimony was struck from the record. Later plaintiff sought to question his witness Fisher, the civil engineer, as to whether he considered the crossing extra-hazardous. However, since plaintiff had not qualified him as an expert on such a matter, the trial judge ruled that Fisher's opinion on this subject was inadmissible.

At the conclusion of the proofs Pennsylvania moved for a judgment of dismissal on the ground that there was no evidence of negligence on its part and further that plaintiff was guilty of contributory negligence as a matter of law. In granting the motion the trial judge said:

"But giving every possible inference I could to the plaintiff I do not think, in view of the railroad law as it has been decided in the State of New Jersey and even in the face of the *Duffy* case [*Duffy v. Bill*, 32 *N. J.* 278 (1960)], that a jury should have a right to pass upon the negligence or contributory negligence. I think they are legal questions."

On his appeal to the Appellate Division, plaintiff, in urging that the question of Pennsylvania's liability should have been submitted to the jury, contended that the changes which had taken place since 1937 in the area surrounding the intersection had made the crossing extra-hazardous; that the original warning devices were no longer adequate and Pennsylvania had been negligent in not taking additional measures to warn motorists. In reversing the trial court as to Pennsylvania, the Appellate Division held that the case was controlled by *Duffy v. Bill*, 32 *N. J.* 278 (1960), and said:

"In the instant case the area surrounding the crossing had as above noted changed markedly during the two decades since the crossing's creation. The fact that the railroad was not responsible for any of the changes is no longer of importance. The standard set forth in *Duffy, supra*, is peculiarly appropriate to the factual situation here presented. The trial court erred in determining that there was insufficient evidence to submit to the jury the issue of the railroad's alleged negligence."

It also found the question of plaintiff's contributory negligence was for the jury.

On its appeal to this court, Pennsylvania contends that its warning devices were properly located to give an approaching motorist a view of the signals unimpeded by any permanent structures, that the only thing which obstructed plaintiff's view in any way was the Socony tractor-trailer which was temporarily stopped and blocked the flashers on the east

side for a short distance from the crossing, and that a railroad is not liable for any temporary or transitory obstructions. Furthermore, it argues, plaintiff was guilty of contributory negligence as a matter of law.

The plaintiff contends the Appellate Division correctly concluded the testimony required submission of the case to the jury. He argues that several structures had been erected· during the 21 years since the warning devices were installed and the changed conditions required added precautions. In effect, he asserts these changes made the crossing extra-hazardous even if a trailer had not been upon the scene and that there was a clear showing of "necessity for additional safeguards." He also stresses that the signal post on the east side of the highway was improperly placed since a northbound traveller such as he would arrive at the collision point with a train before reaching a point opposite that post. He further asserts the issue of his contributory negligence was for the jury.

■ At the trial plaintiff sought to have his witness Fisher, a civil engineer, testify as to whether he considered the crossing "extra-hazardous." The trial judge properly excluded such testimony since plaintiff failed to qualify Fisher as an expert on the subject. *Rempfer v. Deerfield Packing Corp.*, 4 *N. J.* 135, 141 (1950).

■ Neither party contends expert testimony is always required to establish the necessity for extra precaution where an extra-hazardous condition exists at a railroad crossing. Both agree that expert testimony could be admitted in an appropriate case to aid the jury in reaching its conclusions. Indeed, such testimony may be necessary in most cases. *Duffy v. Bill, supra,* 32 *N. J.,* at *p.* 294. However, since neither party called an expert qualified on this subject, we will not pursue the matter further.

■■ Plaintiff sought to introduce evidence of two accidents which occurred at this crossing, one prior to and the other after the date of his mishap. Safety history may be admissible for some purposes but before it can have any

probative value it is incumbent upon the party who offers the evidence to show the other occurrences took place under the same or substantially the same conditions as the accident in question. The plaintiff made no effort to show the circumstances of the other accidents. Therefore the trial judge correctly kept this material from the jury. *McCormick, Evidence* § 167 (1954); Price, "Extra-hazardous Railroad Crossings," 7 *Baylor L. Rev.* 170, 179 (1955).

Two provisions govern the statutory standard of care owed by a railroad to travellers on all grade crossings. They are: *N. J. S. A.* 48:12–57 which requires every engine to sound a specified bell or horn at least 300 yards from a crossing, continuing the sound until the engine has crossed the highway, and *R. S.* 48:12–58 which requires that a crossing be marked by a conspicuous warning sign approved by the Board of Public Utility Commissioners. *N. J. S. A.* 48:12–54 provides for other types of warning devices approved by the Board of Public Utility Commissioners where railroad tracks cross "any public road which is improved by joint action of the state and a municipality or county." This statute is inapplicable here since Route 130 is not such a road. In any event, the Board of Public Utility Commissioners had approved the warning devices at the crossing in question.

In *Duffy v. Bill, supra,* we reviewed in detail the law regarding the degree of care owed by railroads to motorists and set forth principles to be utilized in determining the railroad's liability. Duffy was a passenger in an automobile driven by Bill in a built-up area of Union Beach, Monmouth County. The vehicle was headed in a northeast direction along a road which crossed an east to west railroad track at an oblique angle. The crossing bounded a large open field, providing a motorist with a view of the track for a considerable distance. A power company building and parking lot were located just beyond the crossing in respect to a car travelling northeast. The only warning sign which marked the intersection of the road with the tracks was

a standard crossbuck pole sign without bells or lights. At 9:30 at night Bill's car collided with a train and Duffy was killed. Duffy's administratrix sought to hold the railroad company liable for negligence. Bill testified he could not see the approaching train because the illumination from the power company and parking lot was so blinding it reduced his vision to 100 feet. Although Bill did not hear them, there was testimony that the engine's bell and horn were sounding to warn of the train's approach. The trial judge charged the jury that if they found the bell or horn was sounded as required by law, they must return a verdict in favor of the railroad. He said:

"It is not your function and you must not consider the adequacy of the protection provided at the crossing in question. The statute * * * is the total duty required of the defendant."

The jury verdict was in favor of the railroad and against Duffy. On plaintiff's appeal, she contended that mere compliance with the statutory requirements should not absolve a railroad from liability where its crossing was extra-hazardous to travellers, even though the railroad did not create the condition, and that the then existing decisional law to the contrary should be overruled. We agreed with this contention and said, 32 *N. J.*, at *pp.* 292–293:

"A just measure of care would seem to be that, although in the ordinary case the statutory warning is sufficient, extra hazards at crossings require extra precaution in warning travelers, whether or not the railroad has created the hazard. The extra-hazardous nature of a crossing is a question of fact for the jury, but not until the trial court first determines that there is sufficient evidence to warrant the question to be submitted. Ultimate recovery, of course, depends on the absence of contributory negligence on the part of plaintiff and the existence of a legally sufficient causal relationship between the collision and the railroad's failure to give proper warning of the approach of the train and of the unusual conditions at the crossing. By so eliminating from our law the requirement that plaintiffs must prove the hazard to be of the railroad's creation before extra warning precautions are required, we bring ourselves in line with the general rule prevailing elsewhere and we adopt that measure of due care. [citing cases]"

Thus *Duffy* overruled a line of cases in this State, *e. g.*, *Siracusa v. Atlantic City R. R. Co.*, 68 *N. J. L.* 446 (*Sup. Ct.* 1902), which limited the railroad's obligation to provide extra statutory warning devices to those cases in which the railroad itself created the extra-hazardous situation at the crossing. In overruling these cases, we reverted to a rule declared in prior decisions, effectively summarized in *Telfer v. Northern Railroad Co.*, 30 *N. J. L.* 188, 193 (*Sup. Ct.* 1862), as: "The care to be used in avoiding collisions with ordinary vehicles upon the public highways, must be in proportion to the danger incident to the particular locality." Therefore, the degree of care which a railroad must exercise in warning others of the approach of its train is measured by the hazardous nature of the crossing and not solely by the statutory requirements.

■■ To determine whether a railroad has exercised reasonable care in affording protection to travellers on the highway, it is necessary to take a broad view of the locale, *i. e.*, the crossing, the area surrounding it and the safety precautions taken to warn such travellers of approaching trains. In the ordinary case the statutory warnings are sufficient. However, if the crossing is so peculiarly dangerous that reasonably prudent persons cannot use the highway in safety then the railroad has a duty to employ extra means to signal the approach of its trains. *Pennsylvania R. R. Co. v. Matthews*, 36 *N. J. L.* 531, 534 (*E. & A.* 1873). See Price, "Extrahazardous Railroad Crossings," 7 *Baylor L. Rev.*, *supra*, at *p.* 182. In other words, railroad accident crossing cases are now considered in the light of general tort law: absent contributory negligence, the railroad is liable to an injured person if it has not taken safety measures commensurate with the danger involved.

In *Duffy v. Bill, supra,* we stated the question of whether a crossing is extra-hazardous would be for the jury, "but not until the trial court first determines that there is sufficient evidence to warrant the question to be submitted." *Id.*, 32 *N. J.*, at *p.* 293. By the very result in *Duffy*, affirm-

ing the trial court's decision to withhold from the jury the question of whether the ordinary statutory signals were sufficient, we held as a matter of law that where the adequacy of the railroad's warnings to travellers is beyond debate, the railroad is not liable. We said, at *p.* 293:

"We are satisfied, however, that the trial court did not err in failing to give the question of the necessity for extra warning devices to the jury in this case. A review of the record in the matter at hand leads to the conclusion that there is no evidence from which a jury could determine that the ordinary statutory signals were not adequate warning. We hold, therefore, that, as a matter of law, the railroad's failure to provide extra precautions was not negligence under the facts of this case. There is no evidence from which a jury could determine that the sound of the horn and bell from the approaching engine and the presence of the warning sign were not sufficient warning to travelers approaching the crossing with the degree of care which the railroad is entitled to expect. [Citing cases]"

██ In appraising the sufficiency of a warning system maintained at a railroad crossing, the important question is whether the system adequately alerts reasonably prudent travellers to the hazards of the crossing. Motorists cannot be expected to detect concealed dangers, but they can be expected to observe clear warnings of approaching peril and a railroad is entitled to rely on the fact that motorists will be attentive to such warnings. If the safety measures are sufficient to warn a reasonably prudent driver the railroad has fulfilled its duty.

█ In applying the general principles set forth above, we must view the evidence in the light most favorable to the plaintiff to determine whether a jury question is presented. *Mellon v. Pennsylvania-Reading Seashore Lines,* 7 *N. J.* 415, 419 (1951).

█ The area about the crossing had changed in several respects since the warning system was first installed; buildings and billboards had been erected and vegetation had been permitted to grow. At the time of the accident a tractor-trailer blocked plaintiff's view of one set of flashing

lights when he neared the crossing. The tracks were imbedded in heavily travelled Route 130 and the warning posts were set back from the center point of the crossing. If reasonable men could conclude these factors imposed upon defendant a duty to provide safeguards in addition to those maintained, the case should have been submitted to the jury.

None of the permanent structures complained of in any way reduced the effectiveness of defendant's warning system. They neither obstructed a view of the flashing lights and warning signs, nor emitted any sounds to compete with the warning bells and whistle. Their only adverse effect was to block to a limited degree a view of the train proper as it approached the crossing. Automatic warning devices at grade crossings, unlike the standard crossbuck sign, are designed to alert the traveller to stop in a place of safety even though he does not or cannot see an approaching train. In effect, such devices are a substitute for an unobstructed view of the train as it nears the crossing. While the standard crossbuck sign is designed merely to inform a traveller that he is nearing a railroad crossing, automatic devices do much more; they warn that a train is actually approaching.

The question in the present case is whether Pennsylvania's warning system taken as a whole, gave sufficient notice of danger. The highway was straight, providing a clear view for at least one mile. A prudent northbound motorist could see four flashing lights, a crossbuck sign, a rectangular sign, a sign on the road and a broken white line merging into a solid line, and hear post bells, a train bell and an air horn. He could observe and hear all of these warnings a safe distance before he reached the crossing. The plaintiff never contended any part of the warning system was inoperative on the day of the accident; indeed, the evidence was all to the contrary. He merely stated that he did not see the flashers or signs, although he admitted hearing a horn. The fact that the warning post on the east side was located 21 feet six inches north of the mid-

point of the crossing makes no difference in this case. Plaintiff does not set forth the adverse effect upon him of such positioning. Since he never saw the flashers he could not have been misled into believing that the track was placed at some point north of its actual location. The flashers are designed to provide a distant warning and a location 21 feet closer or farther away along a line parallel to the roadway can make no difference in the ability of a motorist to see the signals. The fact that the stopped tractor-trailer temporarily blocked the view of one of the flashers does not make Pennsylvania negligent. Even if the railroad must foresee there will be temporary obstructions at the crossing and provide additional warnings because of them, the Socony tractor-trailer did not detract from the effectiveness of the warning system until the plaintiff had reached a point 100 feet from the crossing, and even at that point, the signals on the opposite side of the road were flashing and bells and a horn were sounding. We find reasonable men could not differ, notwithstanding the changes in the area, that the warning system provided by Pennsylvania was sufficient to alert a reasonably prudent motorist of an approaching train so that he could use the crossing with safety, particularly since there was no offer of expert proof that reasonable care would require the installation of devices in addition to those which Pennsylvania did provide. Therefore, we hold the trial court correctly determined that the issue of Pennsylvania's negligence should not be submitted to the jury. In light of the above, we need not consider the question of plaintiff's contributory negligence.

Pennsylvania argues that compliance with the requirements of the Public Utility Commission should in and of itself absolve it from liability. If this were its sole defense, Pennsylvania would not have prevailed. Just as a railroad cannot rely upon conformity with the statutory requirements to absolve itself from liability in all cases, it cannot rely upon adherence to an agency's regulations. The

railroad is under a duty to appraise changing conditions and alter its warning system if necessary to safeguard reasonably prudent motorists even if the Public Utility Commission has not ordered a change. As we said in *Duffy*, 32 *N. J.*, at *p.* 292: "[T]he Public Utility Commission may not be aware of the danger until a number of collisions occur whereas the railroad is better able to acquaint itself with the hazards involved."

The judgment of the Appellate Division is reversed and that of the Law Division is reinstated. No costs.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.