74 N.J. Super. 381 (1962)
181 A.2d 400
ROSALIE SHUTKA, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF STEPHEN SHUTKA, JR., DECEASED, PLAINTIFF-RESPONDENT,
v.
THE PENNSYLVANIA RAILROAD COMPANY, A CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 13, 1961.
Decided May 21, 1962.
*386 Before Judges CONFORD, FREUND and LABRECQUE.
Mr. Stephen V.R. Strong argued the cause for the appellant (Messrs. Strong & Strong, attorneys).
Mr. Stanley W. Greenfield argued the cause for the respondent.
The opinion of the court was delivered by LABRECQUE, J.S.C. (temporarily assigned).
This case arises out of a railroad grade crossing collision in which plaintiff's decedent, Stephen Shutka, Jr., met his death. Plaintiff, mother of the decedent, as administratrix ad prosequendum of his estate, brought suit to recover damages under N.J.S. 2A:31-1 et seq., in her own behalf and on behalf of the sister of the decedent. At the trial in the Law Division, Middlesex County, the jury rendered a verdict for the plaintiff in the sum of $60,000. A subsequent motion for a new trial or for judgment n.o.v. was denied by the trial court. Hence the present appeal.
Plaintiff's decedent was 27 years of age at the time of the accident. He was totally deaf and dumb and likewise suffered from defective vision. He was, however, the holder of a valid New Jersey license which required him to wear corrective glasses when operating an automobile. He was unmarried and lived with his widowed mother and his arthritic, deaf-mute sister on a farm owned by the mother which he operated.
The accident occurred at the Culver Road crossing of defendant's railroad, near the Town of Dayton, N.J., at approximately 7 P.M. on December 31, 1958. The weather conditions were dry and clear. It was dark and the automobile's headlights were on. Culver Road, upon which the decedent was proceeding, terminated a short distance from the accident. It was an ordinary black-top, 50-mile-an-hour road, running in a general north-south direction. In the immediate vicinity of the tracks the road was straight, but *387 it curved a short distance before the crossing. The single-track, electrified rail line of the defendant ran in a general east-west direction. The train involved was a single, electrified passenger coach, which had been proceeding in a westerly direction and approached the crossing from the decedent's right. Protection at the crossing was restricted to two of the usual crossbuck signs, one on each side of the right-of-way. The decedent was thoroughly familiar with the crossing from his continued residence on his mother's farm which was located on Culver Road not far away.
The only eyewitness to the accident was one Herbert W. Staer, the train's engineer. He testified that immediately prior to the collision the train had been proceeding towards the crossing at a speed of between 30 and 35 miles per hour, with its headlight operating on the bright beam and with the interior lights on in the coach. When he was a distance of approximately 1300 feet from the crossing, he put the train's automatic bell into operation and began blowing the whistle. Although he had observed the approaching headlights of the decedent's car sometime earlier, it was not until the train was some 75 to 100 feet from the crossing that he became aware that the automobile was not going to stop. He thereupon applied his emergency brakes but asserted that it was too late to avoid the collision.
After the impact the train's momentum carried it a distance of some 400 to 500 feet. When it finally stopped, Staer pushed the "down" button which caused the pantograph collector to retract, thus disconnecting the train from its overhead source of electric power. The lighting system of the train then became dependent for power upon the car's batteries.
Trooper William J. Maher, a member of the New Jersey State Police who was assigned to investigate the accident, testified that he observed the train headlight after the power had been restored and that "* * * it was not bright, it was not real bright." And further that "The light was very pinkish, dull * * * It wasn't even *388 throwing a beam down the track * * *." Trooper Maher testified that he and another member of the State Police conducted a search of the area of the accident in an endeavor to locate the glasses that Shutka was required by his conditional license to wear while driving. These were never located or accounted for. However, there was testimony that he was wearing glasses when he left home shortly before the accident, and that he always wore them. Trooper Maher also testified that there were automobile skid marks totalling 21 feet in length beginning before the crossing and terminating one foot the other side of the tracks.
A number of persons residing in the vicinity of the crossing, who were familiar with it and with the topography of the adjacent area, testified on behalf of the plaintiff. The collective import of their testimony was that the headlights of trains going over the crossing were dim and easily confused with the background street lights of the main street in the Town of Dayton. The testimony is conflicting as to the precise point at which a driver travelling in the same direction as the decedent would have a clear view of oncoming trains free from obstructing trees or underbrush. On the roadside to the right as decedent approached the crossing the investigating state policeman stated he found shrubs, bushes and weeds which ended approximately 20 feet before the crossing. Other testimony was to the effect that these ended some 99 feet from the tracks. According to another witness, the bushes and shrubs grew on top of a bank which was approximately three feet above the road surface. A number of witnesses familiar with the locality, testified that the shrubs and bushes obstructed the view of an approaching train. Trains were operated in both directions over the single track. Prior to reaching the crossing, a train proceeding westerly would cross the main street of the Town of Dayton (Old George's Road) at a point about half a mile before the crossing. There was testimony that, as it approached thereafter, the train lights would blend into the background of the street lights of the town.
*389 The first question presented is whether the trial court erred in denying the defendant's motion for dismissal and its subsequent motion for judgment pursuant to R.R. 4:42-2(b) and R.R. 4:51-1, based upon the asserted contributory negligence of the decedent. The same ground was urged in support of a motion for a new trial and for judgment n.o.v. (R.R. 4:51-2), both of which were denied by the trial judge.
It is asserted that the evidence adduced at the trial conclusively established the decedent to have been contributorily negligent as a matter of law. In factual support of this contention defendant urges that Shutka could not hear; that he was permitted to drive only when using glasses; that the glasses were never located; that he knew of the presence of the crossing and failed to apply his brakes (as evidenced by the skid marks) until he was some 15 feet from the track, notwithstanding that he had a clear, unobstructed view from a point 156 feet from the crossing. In its argument upon this point, defendant relies upon Gifford v. Pennsylvania R. Co., 119 N.J.L. 397 (E. & A. 1938); George Siegler Co. v. Norton, 8 N.J. 374 (1952); Pangborn v. Central Railroad Co. of N.J., 18 N.J. 84 (1955), together with Swenson v. Chicago, M., St. P. & P.R. Co., 336 Ill. App. 287, 83 N.E.2d 375 (App. Ct. 1949), and Faircloth v. Atlantic Coast Line Railroad Company, 247 N.C. 190, 100 S.E.2d 328 (Sup. Ct. 1957).
The question of the existence vel non of contributory negligence is ordinarily one for determination by a jury rather than by a court. Battaglia v. Norton, 16 N.J. 171, 179 (1954). Only in the clearest case of contributory fault when the contrary hypothesis is not fairly admissible does the question become one of law. Pangborn v. Central Railroad Co. of N.J., supra. Where different minds may reasonably come to different conclusions as to the facts, or may reasonably disagree as to the inferences derivable from the facts, whether controverted or not, the question is one for the jury. Mellon v. Pennsylvania-Reading Seashore Lines, *390 7 N.J. 415 (1951); cf. Kaufman v. Pennsylvania Railroad Co., 2 N.J. 318 (1949). While the reasonable man test is thus to be applied, as was pointed out in Battaglia, supra, care is to be taken that the reasonable man be not endowed with attributes which rightfully belong to a person of exceptional perspicuity and foresight.
The facts in the cases cited by the defendant in support of its motion, make them readily distinguishable. Thus in Gifford v. Pennsylvania R. Co., supra, Gifford was in full possession of his faculties and was operating his car over a private crossing. The surrounding territory was, in general terms, an open field, substantially level. There were no obstructions to the view in any direction except a few trees not yet in leaf; telephone poles; and some low banks of earth which looked as if designed to prevent golf balls from rolling on the track. The court went on to say that "* * * no one about to cross the track and looking for a train, as it would be his duty to do, could fail to see it in ample time to stop and avoid it, even though it was running at about sixty miles an hour." In that case the accident occurred during the daylight hours.
In George Siegler Co. v. Norton, supra, the accident likewise took place during daylight. In addition, in that case there were two sets of tracks separated by an open space of from 30 to 50 feet. The driver of the truck there involved, had passed over the first set of tracks and the intervening open space before being struck by the train on the second set of tracks. There was uncontroverted testimony that there was an unobstructed view of the tracks on which the train was running for a considerable distance, perhaps a little less than a half-mile, and that the 30 to 50 feet of land separating the two sets of tracks could easily have accommodated the truck had the driver chosen to stop. The court there held that the driver "* * * had he looked, could have seen the approaching train approximately half a mile away." (8 N.J., at p. 384.)
*391 Swenson v. Chicago, M., St. P. & P.R. Co., supra, was another daylight collision case in which the plaintiff admitted that he did not look in the direction of the approaching train until he was about 20 feet from the intersection, and even then did not stop his car but merely swerved to the right.
In Faircloth v. Atlantic Coast Line Railroad Company, supra, while the accident occurred at night, the road was straight for a distance of 615 feet approaching the railroad crossing. From a point 96 feet south of the crossing, an approaching train was visible for a distance of 2000 feet. The plaintiff's vehicle, after skidding some 35 feet, ran into the moving train at the crossing. The occupants of the car had all been talking prior to the accident.
The facts of the case sub judice differ from the facts in the cited authorities in a number of important respects. The accident occurred in the night time. The decedent was handicapped by his inability to hear and hence was relegated to the use of his eyes in avoiding danger. See Prosser, Torts (2d ed. 1955), § 31, p. 126. The presence of the curve in close proximity to the track precluded an effective view of the train until that point was passed. Thereafter the testimony was to the effect that there were obstructions to vision. While the defendant's expert asserted that there was no obstruction from a distance of 162 feet from the track until the crossing was reached, this was disputed by the plaintiff, who produced testimony that obstructing shrubbery was cut down after the accident.
The plaintiff was entitled to a presumption that her decedent exercised due care under the circumstances. Danskin v. Pennsylvania R. Co., 79 N.J.L. 526, 529 (E. & A. 1910); Bergmann v. Public Service Railway Co., 98 N.J.L. 487 (E. & A. 1923); Bergquist v. Penterman, 46 N.J. Super. 74, 89 (App. Div. 1957). Contributory negligence was a matter of defense and she was not required to prove its absence as a part of her case. Danskin v. Pennsylvania R.R. Co., supra (79 N.J.L., at p. 528). *392 No presumption of negligence arose from the mere happening of the accident. Ibid.
In addition to the obstructions to view, two other factors required consideration by the jury in determining whether the defense of contributory negligence had been established. The first of these was the character of the electric headlight on the train itself. While the defendant claimed that the electricity had been shut off after the accident by the lowering of the pantograph from the overhead wire, and that the headlight thereafter was actuated by battery power, yet, as noted above, the investigating State Trooper testified that after the electricity was restored, the headlight was "* * * not bright * * *. It was on the pinkish side." On cross-examination he stated that "The light was very pinkish, dull," and "It wasn't even throwing a beam down the track * * *." This was somewhat corroborated by another witness who had seen the train after the accident. The engineer affirmed that he had not changed the position of the headlight switch (which would vary the intensity of the headlight beam).
In addition, there was the testimony as to the effect of the background lighting furnished by the street lights in the town itself upon the lights of approaching trains. As the driver approaches the intersection he is facing this lighted background. One witness, Mollenhauer, testified that the locomotive headlight "blends right into it." Another witness, Birkenthal, testified that the lights of a train coming from the right and the background lights "look almost alike." Still another witness, Renk, said the background lights "confuse you with the street lights and train lights, especially if the train light is not bright. You don't know what you are seeing when a train is coming up there."
In the instant case, therefore, the jury was not necessarily relegated to a finding that the decedent did not have his glasses with him or that he made no observation until he was 15 feet from the track. It was equally open to the jury to find that he was wearing his glasses and that he made reasonably effective observations, but that by reason *393 of the obstructions, or of the dim light on the locomotive, or of the difficulty of detecting the train's approach by reason of the lights in the background, he did not observe its approach in time to stop. There was evidence, as already indicated, to the effect that when he left home prior to the accident, he was wearing his glasses. Accordingly the trial court properly submitted the question of decedent's contributory negligence to the jury. Ackerley v. Pennsylvania R. Co., 130 N.J.L. 292 (E. & A. 1943); Danskin v. Pennsylvania R. Co., supra; cf. Kopec v. Kakowski, 34 N.J. 243 (1961). Our conclusion in this respect is in no wise altered by the photographs received in evidence on defendant's part which purport to show the visibility attendant upon the approach of a train from the right at night. As to this, plaintiff contends that the locomotive headlight in the photograph is obviously quite bright, whereas her witnesses testified that the light was dim on the night of the accident. In any event, the photographs did no more than create a factual issue for the jury's determination.
Implicit in the jury's verdict was a finding of lack of contributory negligence on the part of the decedent. As has been pointed out supra, there was adequate evidence to support such a finding and, on defendant's application for a new trial, the trial court could not substitute its conclusions for those of the jury. Hager v. Weber, 7 N.J. 201 (1951); Monihan v. Public Service Interstate Transp. Co., 22 N.J. Super. 149 (App. Div. 1952).
Defendant next contends that the trial court erred in permitting the jury to determine whether or not the grade crossing in question was extra-hazardous.
With certain exceptions not here relevant, the standard of care generally owing by a railroad to travellers at grade crossings is contained in two provisions of our statutory law. N.J.S.A. 48:12-57 requires every engine to sound a bell or a horn or whistle at least 300 yards from a crossing, and continuing until the engine has crossed the highway. R.S. 48:12-58 requires that each crossing be *394 marked by a conspicuous warning sign approved by the Public Utility Commission. In Duffy v. Bill, 32 N.J. 278 (1960), however, our Supreme Court had occasion to review in detail the law regarding the degree of care owed by railroads at such crossings and to point out when, and under what circumstances, additional precautions were required. In that case, Duffy was a passenger in an automobile being operated in a built-up area of Monmouth County. The road on which it was being driven crossed the railroad's tracks at an oblique angle and the crossing adjoined large open fields which provided an approaching motorist with a view of the tracks for a considerable distance. There was, however, a power company building and parking lot just beyond the crossing in respect to the direction of travel of the car. The only warning sign was the standard crossbuck pole sign. The accident occurred at night. The driver testified that he could not see the approaching train because the illumination from the power company and from the parking lot was so blinding that it reduced his vision to 100 feet. The trial court charged the jury that if they found that a bell or horn was sounded as required by law, they were required to return a verdict in favor of the railroad. On appeal it was contended that the mere compliance with the statutory requirements did not absolve the railroad from liability where its crossing was extra-hazardous to travellers even though the railroad itself did not create the condition. This was contrary to the then existing decisional law. The Supreme Court, while affirming, held, at pp. 292-293:
"A just measure of care would seem to be that although in the ordinary case the statutory warning is sufficient, extra hazards at crossings require extra precaution in warning travelers, whether or not the railroad has created the hazard. The extra hazardous nature of a crossing is a question of fact for the jury, but not until the trial court first determines that there is sufficient evidence to warrant the question to be submitted. Ultimate recovery, of course, depends on the absence of contributory negligence on the part of plaintiff and the existence of a legally sufficient causal relationship between the *395 collision and the railroad's failure to give proper warning of the approach of the train and of the unusual conditions at the crossing. By so eliminating from our law the requirement that plaintiffs must prove the hazard to be of the railroad's creation before extra warning precautions are required, we bring ourselves in line with the general rule prevailing elsewhere and we adopt that measure of due care."
Previous to Duffy v. Bill the railroad's obligation to provide extra statutory warning devices, was limited to instances where the railroad itself created the extra-hazardous conditions at the crossing. Siracusa v. Atlantic City R. Co., 68 N.J.L. 446 (Sup. Ct. 1902), but see Telfer v. Northern Railroad Co., 30 N.J.L. 188, 193 (Sup. Ct. 1862).
In DiDomenico v. Pennsylvania-Reading Seashore Lines, 36 N.J. 455, 467 (1962), the procedure to be applied in determining whether a crossing is extra-hazardous and whether the railroad has exercised reasonable care in affording protection to travellers on the highway is set forth as follows:
"To determine whether a railroad has exercised reasonable care in affording protection to travellers on the highway, it is necessary to take a broad view of the locale, i.e., the crossing, the area surrounding it and the safety precautions taken to warn such travellers of approaching trains. In the ordinary case the statutory warnings are sufficient. However, if the crossing is so peculiarly dangerous that reasonably prudent persons cannot use the highway in safety then the railroad has a duty to employ extra means to signal the approach of its trains. Pennsylvania R.R. Co. v. Matthews, 36 N.J.L. 531, 534 (E. & A. 1873). See Price, Extra-hazardous Railroad Crossings, 7 Baylor L. Rev., supra, at p. 182. In other words, railroad accident crossing cases are now considered in the light of general tort law: absent contributory negligence, the railroad is liable to an injured person if it has not taken safety measures commensurate with the danger involved."
As has been noted, the extra-hazardous nature of a crossing was a question of fact to be determined by the jury, but not until the trial court had first determined that there was sufficient evidence to warrant submission of the question. Defendant urges that here it was erroneous *396 for the court to have submitted the issue to the jury since the situation involved no more than the normal hazards attendant upon a railroad grade crossing. Defendant's argument is not borne out by the testimony. The crossing in question was just beyond a curve in the road. There was testimony that there were obstructions to view after motorists passed the curve and that, at night, the approach of a train towards the crossing from the right was made difficult of detection because of the fact that a motorist looking towards the train was likewise looking into the cumulative background lights of the Town of Dayton into which the train lights blended. The resolution of the question was thus for the jury.
In DiDomenico the Supreme Court affirmed the action of the Law Division granting the defendant's motion for dismissal, holding that where the adequacy of the railroad's warnings to travellers is beyond debate, the railroad is not liable. In appraising the sufficiency of the warning system maintained at a railroad crossing, the important question is whether the system adequately alerts reasonably prudent travellers to the hazards of the crossing. If the safety measures are sufficient to warn a reasonably prudent driver, the railroad has fulfilled its duty. Ibid., p. 468.
However, there exists no similarity between the facts in DiDomenico and those in the instant case. In the former the accident occurred on a single track line intersecting a state highway in Upper Penns Neck, Salem County. The highway was straight and level for a considerable distance in the area of the crossing, and formed an angle of 149 degrees with it. It was 60 feet wide and contained two ten-foot concrete lanes with wide shoulders and with a white line separating the two lanes. The crossing was marked by the usual warning sign posts and by four back-to-back type, alternately flashing red lights with a bell mounted at the top of each post and a reflector sign under each set of lights. A motorist approaching the intersection was confronted with alternately flashing lights on both the *397 right and left hand sides of the street. Just before the accident, a tractor-trailer had stopped on the right macadam shoulder, thus momentarily interfering with the plaintiff's view of the flashing light signal on the right. When plaintiff reached a point approximately parallel with the tractor-trailer, he noticed that an automobile which was headed in the opposite direction was stopped in the opposite lane. He also heard a loud air horn. He "jammed" on his brakes and observed the oncoming train for the first time as he stopped. He tried to back his vehicle away but it stalled and he was struck by the oncoming locomotive. He testified that he did not see the warning lights to his right because they were blocked by the tractor-trailer, and he could not see the tracks themselves because they were imbedded in the concrete. The driver of the tractor-trailer testified that when the flashing lights began to operate he had just stopped on the shoulder preparatory to proceeding through the crossing. The driver of the car which had stopped for the train to pass testified that the blinker on the west side (the plaintiff's left) was operating and could be seen flashing 200 to 300 feet away. The safety devices at the crossing had been approved by the Board of Public Utility Commission in 1937. Thereafter, additional structures had been erected in the vicinity of the crossing. However, none of these blocked a motorist's view of the warning posts and lights on the crossing. Based upon these facts, there was an affirmance of the trial court's finding that, as a matter of law, the defendant was not obligated to provide precautions other than those referred to.
In contrast to DiDomenico, in the instant case there were no extra precautions provided, notwithstanding the testimony as to the nature and layout of the crossing. We hold that the evidence adduced was sufficient to warrant submission to the jury of the question of the extra-hazardous nature of the crossing.
Defendant next urges that the trial court erroneously admitted the testimony of the plaintiff's expert, Ensley R. *398 Bennett, Jr., as bearing upon the asserted extra-hazardous condition.
Bennett was a traffic consultant. He had been employed by municipal officials, police departments, attorneys, planning boards and private corporations in his chosen field. He had designed traffic control signals, intersection channelization, and parking facilities for hundreds of municipalities. He had investigated and analyzed "practically every type of traffic problem." He had been called upon to make decisions concerning the necessity or need of traffic controls. He had lectured at Rutgers University and at the New Jersey State Police Academy on traffic safety. He had participated as an expert in safety courses given for employees of the Esso Standard Oil Company. He had a thorough knowledge of traffic control devices and was familiar with the various publications on that subject including, The Traffic Engineering Handbook by the Yale University Bureau of Traffic, and the Manual on Uniform Traffic Control Devices of the Public Roads Administration. He had been employed by the State of New Jersey in the Traffic Engineering Section of the Bureau of Traffic Safety in the Department of Motor Vehicles for about nine years. He testified, however, as a private consultant.
Bennett testified as to the conditions at the crossing and the standards applicable to such conditions. It is contended by the defendant that the testimony should not have been admitted, the matter in question being such that the jury was capable of forming a correct judgment without the necessity of resorting to the peculiar knowledge of an expert witness. Krieg v. Timken, 102 N.J.L. 307 (E. & A. 1926).
In Rempfer v. Deerfield Packing Corp., 4 N.J. 135 (1950), the general rule setting forth the circumstances under which the testimony of experts may be employed, was stated as follows:
"* * * The true test of admissibility of such testimony is not whether the subject matter is common or uncommon or whether *399 many persons or few have knowledge of the matter; but it is whether the witnesses offered as experts have peculiar knowledge or experience not common to the world which renders their opinions founded on such knowledge or experience any aid to the court or jury in determining the questions at issue." (at pp. 141-142)
Although expert testimony is not always required to establish the necessity for extra precautions where an extra-hazardous condition exists at a railroad crossing, such testimony is admissible in an appropriate case to aid the jury to reach its conclusions. It may be necessary in most cases. Duffy v. Bill, supra (32 N.J., at p. 294).
The expert witness in question was found to have the necessary qualifications. He possessed a peculiar knowledge and experience not common to the world in general which rendered his opinion an aid to the jury in determining the issues at hand. Rempfer v. Deerfield Packing Corp., supra; Pincus v. Sublett, 26 N.J. Super. 188, 192 (App. Div. 1953), certif. denied 13 N.J. 294 (1953). His testimony was properly allowed.
The defendant next contends that the trial court committed error in failing to strike certain portions of Bennett's testimony. During the course of his examination he was asked as part of a hypothetical question "* * * whether or not the crossing then and there conformed to the standards of care with regard to public travel on public roads?" His response was that it did not. He had previously testified without objection that he was familiar with the standards with regard to safety at various crossings in the State of New Jersey and that he had examined the crossing in question some four to six times. The ground of objection urged was that the witness was being permitted to give an opinion on the very matter which was to be submitted to the jury for its consideration, citing Taylor v. Kelvin, 121 N.J.L. 142 (E. & A. 1938); In re McCraven, 87 N.J. Eq. 28 (Ch. 1916), and Krieg v. Timken, supra.
The ultimate question which the jury was being called upon to determine was whether the defendant was negligent *400 in the maintenance of the crossing or the operation of its trains thereon, and whether such negligence was the proximate cause of the accident. The jury's determination required consideration of a number of issues, one of them being the extent of the precautions required of the defendant. This, in turn, depended upon the nature of the crossing itself, i.e., whether it was extra-hazardous and thereby required extra precautions. In determining whether the precautions utilized by the defendant were in conformity with reasonable care, testimony as to the standards at such crossings was properly offered. The proffered evidence thus involved an opinion upon a matter upon which the ultimate question depended.
In a number of cases it has been stated as a broad general rule of law, often assumed to be inflexible, that an expert is not entitled to give his opinion upon the ultimate question that is for determination by the jury. The ground advanced for this rule is that an expert in so testifying usurps the function of the trier of the facts.
Assuming, however, that the issues in a case properly call for the admission of expert testimony, it is generally recognized that there is logically no wrongful invasion of the province of the jury in permitting an opinion to be expressed as to whether a given installation accords with applicable standards or safe engineering practice. Beck v. Monmouth Lumber Co., 137 N.J.L. 268, 277 (E. & A. 1947). In such a case, expert testimony invades the province of the jury no more than does direct evidence of an eye witness to a decisive fact. If the jury is satisfied as to the trustworthiness of the evidence, it may prove to be conclusive of the issue; but it is not bound to accept the opinion or to render its verdict in accordance with it. An expert's opinion of necessity rests upon an assumption of fact. If this assumption of fact is given in a hypothetical question, its weight depends wholly upon whether the jury finds that the fact or facts encompassed in the question have been proved. If the assumption of fact upon which the expert's *401 testimony rests is based is the expert's own testimony as to the facts, it is still open to the jury's belief or disbelief. Moreover, the correctness of the opinion itself is to be evaluated by the jury in light of its apparent reasonableness, of the jury's confidence in the skill of the expert and of any contradiction from other experts.
It is now generally recognized that courts, even the ones which profess to do so, do not follow inflexibly the rule as to exclusion of expert testimony on the ultimate fact. The modern tendency is to receive such expert testimony where it appears that the trier of the facts would thereby be assisted in the solution of the ultimate problem. 20 Am. Jur., Evidence, § 782, pp. 653-656 (1939); 1 Conrad, Modern Trial Evidence (1956), § 663, pp. 548-550; 2 Jones, Evidence (5th ed. 1958), § 418, pp. 788-790; Annotation, 78 A.L.R., pp. 755-759 (1932). But see 7 Wigmore, Evidence, (3d ed. 1940), §§ 1920 and 1921, pp. 17-19, which urges that the rule should be entirely discarded. This view has been embodied in the Uniform Rules of Evidence, Rule 56(4) where it is stated:
"Testimony in the form of opinions or inferences otherwise admissible under these rules is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."
Cf. Tyree, "The Opinion Rule," 10 Rutgers L. Rev., 601, 605 (1956).
Of course, a statement by a witness which amounts to little more than an expression of his belief as to how the case should be decided, or as to the amount of damages which should be given, or as to the credibility of certain testimony, is in an entirely different category. There is no necessity for such evidence, and to receive it would tend to suggest that the judge and jury may vest responsibility for decision upon the witnesses. McCormick, Evidence (1954), § 12, pp. 24-28, at p. 25. But the opinion testimony of experts relating to the ultimate issue, i.e., the propriety and safety of a condition or appliance, is allowed in those *402 cases in which such testimony is reasonably necessary to give the court and jury an intelligent understanding of the subject matter in controversy. Beck v. Monmouth Lumber Co., supra, at p. 277. When the subject matter under dispute is not of common knowledge, and where the witness offered as an expert has peculiar knowledge or experience not common to the world in general which renders his opinion an aid in determining the question in issue. Rempfer v. Deerfield Packing Corp., supra (4 N.J., at p. 142). In Krieg v. Timken, supra, relied upon by the defendant, the alleged expert had testified that it was not proper construction, in building a fence and gateway to protect an area, to have the gate open inward instead of outward, and that such construction was dangerous to the public, whereas the jury did not require the special competence of an expert in deciding the question involved. The court there correctly held the admission of such testimony to be error.
Taylor v. Kelvin, supra, involved a child who was injured in a printing press, and a printer was asked whether or not it would be proper for a boy of the plaintiff's age to work at cleaning such a printing press. As in Krieg, this was a question which did not require expert testimony but was within the ambit of the common everyday knowledge of the average jury.
In re McCraven, supra, relied on by the defendant, is also distinguishable. In that case a witness was asked to give her opinion as to the mental capabilities of an alleged idiot. Although one of the reasons given by the court for its objection to the question was that the question stated the gravamen of the proceeding, it appears that the question was asked of the alleged idiot's mother and not of a person qualified as an expert in mental diseases.
We are not dealing here with a situation such as existed in Bergen County Traction Co. v. Bliss, 62 N.J.L. 410 (E. & A. 1898), where the expert was permitted to give an opinion as to whether a given installation "insured reasonable safeguards." In addition, the expert's opinion in that *403 case was based upon hypothetical facts which had not been previously established. Cf. Beck v. Monmouth Lumber Co., supra (137 N.J.L. 278).
We find no error by the trial court in allowing the question and in its later refusal to strike the answer. The defendant subsequently produced testimony from an equally qualified expert that the crossing protection furnished conformed to applicable standards. In the charge the issue was carefully left to the jury's determination.
It is next contended that the trial court erroneously declined to strike testimony of the expert, Bennett, who had incorporated into his hypothesis facts which would have constituted "express violations of the law." In explaining the reasons for his opinion, he had stated as follows:
"From measurements I took at the crossing, this obstruction to vision  and I refer to trees in this case  were at a point distant from the track where a motorist traveling 50 miles an hour would have only two seconds to look to the right, perceive the train, recognize it, react to it, and begin to stop his automobile. Of course, 50 miles an hour is 75 feet per second. Even if the motorist were able to see the train at the precise moment that it theoretically would be visible he would not be able to stop his car before reaching the track anyway. He would carry past it. This is the reason I believe that the need for the automatic device or gateman was necessary to insure safety at that crossing."
It was admitted that Culver Road was in a 50-mile-an-hour speed zone, but that N.J.S.A. 39:4-98 expressly required every driver to "* * * drive at an appropriately reduced speed when approaching and crossing an intersection or railway grade crossing * * *." Thus, it is urged that if the decedent was operating his car within the limits of the law, he would not have been driving at 50 miles an hour and the testimony of the expert as to the reaction time and distance travelled while approaching the crossing at 50 miles an hour, was therefore improper. The motion to strike the testimony was made conditionally, "if he based it in part *404 on people approaching from different areas of the crossing and trains running in different directions."
We incline to the view that the defendant was in nowise prejudiced by the denial of the motion. Assuming that the ground presently urged had been submitted to the trial court, the court had made it clear, in passing upon a previous objection, that the 50 miles an hour limit referred to by the witness was by way of example. Thus it was said:
"Mr. Strong: I object further on the ground that there is no testimony as to speed in this case.
The Court: I realize that, but he is giving his opinion based on what it may be, and, I suppose, will work his way back to different speeds."
Aside from this, the ground presently urged, i.e., that the reference to 50 miles an hour was improper because the statute required the decedent to slow down as he approached the crossing, was not presented to the trial court. Consequently, the plaintiff is precluded from contending that there was prejudicial error. An objection to testimony should be accompanied by the grounds therefor. R.R. 4:47. The ground stated to the trial court for objecting to the admission of evidence ordinarily measures the field for argument of error on appeal. Burke v. Lincoln Transit Co., 37 N.J. Super. 433 (App. Div. 1955); Apgar v. Hoffman Construction Co., 124 N.J.L. 86 (E. & A. 1940).
It is next urged that the trial court improperly precluded the defendant's expert from testifying as to the results of a traffic count indicating the volume of traffic passing over the crossing. It is argued that this type of evidence constitutes one of the elements laid down in Telfer v. Northern Railroad Co., supra, for consideration in determining whether a crossing is extra-hazardous or not.
Defendant's expert, Thomas F. Callahan, testified that he had taken a count of traffic on Culver Road. His testimony was objected to, and the objection was sustained by the court on the ground that the traffic count was made *405 more than two years after the accident. No attempt was made to relate conditions at the time the traffic count was taken to those which existed at the time of the accident. The ruling of the trial court was within the range of its permitted discretion. It is generally within the discretion of the court to exclude even relevant evidence when its probative value is clearly offset by its remoteness, the danger of undue prejudice, undue consumption of time, or possible confusion of issues. Stoelting v. Hauck, 32 N.J. 87 (1960); Miller v. Trans. Oil Co., 33 N.J. Super. 53 (App. Div. 1954), affirmed 18 N.J. 407 (1955). The trial court may well have considered that the introduction of the traffic count taken after a lapse of two years, without consideration of the changes (if any) which had taken place in traffic patterns in the intervening period, would have served no purpose, and that whatever value the traffic count would have had was more than offset by its remoteness. In excluding the testimony the trial court did not abuse its discretion. Cf. Johnson v. Mason, 70 N.J.L. 13 (Sup. Ct. 1903).
It is next contended that the verdict was so manifestly discordant with the reasonably credible evidence that it was patently the result of mistake, partiality, passion or prejudice; and that defendant's motion for relief therefrom should have been granted. In support of this contention it is argued that there was but one eyewitness to the accident, defendant's engineer, and that the jury in rendering its verdict necessarily disregarded his testimony as to the happening of the accident, the sounding of the statutory signals and the adequacy of the train's headlight. As has been pointed out supra, it was possible for the jury to render a verdict in favor of the plaintiff regardless of whether the statutory signals were given if the crossing was an extra-hazardous one. As to the remainder of the testimony of the engineer, there was contradictory testimony relating to the condition of the headlight and the view to be had of the crossing. The jury was charged with the *406 responsibility of determining whether the crossing was an extra-hazardous one, and if it was, whether the protection furnished was reasonably adequate. Each of the parties produced an expert on this point. Thus, there was sufficient evidence on which to base a finding by the jury in plaintiff's favor. On defendant's motion for a new trial or for judgment in its favor notwithstanding the verdict, the court was precluded from substituting its own judgment for that of the jury. Hager v. Weber, supra (7 N.J. 201, 210); Knickerbocker Ice Co. v. Anderson, 31 N.J.L. 333 (Sup. Ct. 1865). Only when the sole conclusion to be drawn from the jury's verdict is that it was the result of passion, partiality, prejudice or mistake, may the trial court set aside a jury verdict. The printed record before us affords no support for defendant's contention that the verdict could not have been rendered in the absence of such passion, partiality, prejudice or mistake. Annichiarico v. Mobilite, Inc., 19 N.J. Super. 492 (App. Div. 1952); R.R. 1:5-3; R.R. 2:5.
It is finally urged that the jury's verdict was grossly excessive and that such a verdict raises an inference that the jury was actuated by prejudice in its rendition, citing Frank v. Pennsylvania R. Co., 55 A. 691 (Sup. Ct. 1903), not officially reported.
We cannot say that the jury's verdict of $60,000 was so excessive as to justify the inference that it was the result of passion, partiality, prejudice or mistake. Decedent, at the time of the accident, was 27 years of age; his widowed mother was 64 years of age, and his deaf-mute sister was 34. The expectation of life of the mother was 17.05, that of the sister was 42.14, and that of decedent was 43.08 years.
The mother had owned a large tract of real estate of which some 60 acres were devoted to farming. Prior to her husband's death in 1956 he had farmed it, but thereafter it had been farmed for her by the decedent.
There was evidence from which the jury could have concluded that the farm yielded her approximately $5,000 per *407 year. Upon decedent's death the mother continued to operate the farm for about six months and finally had to give up farming altogether. There was also evidence of contributions and services rendered to the sister. Although there was no legal obligation on the part of the decedent to support either, the jury had the right to consider the contributions being made by the decedent to their support and how long they would reasonably be expected to continue under the circumstances. Bohrman v. Pennsylvania Railroad Co., 23 N.J. Super. 399 (App. Div. 1952); cf. Resnick v. Davidson Transfer & Storage Co., 272 F.2d 14 (3 Cir. 1959). In view of the age of decedent's mother and the disability of his sister, the probability of a future marriage by either and subsequent loss of decedent's pecuniary support was more remote than in the ordinary case. Likewise the probability of continued dependency was strong. We cannot say that the amount of the verdict required the intervention of the trial court. The jury was carefully and correctly instructed as to the measure of damages. In our view of the proofs, the amount awarded was not excessive.
Affirmed.